## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JADONNA SANDERS,⠀⠀⠀⠀⠀⠀⠀)
827 HR Dr., SE⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
Washington, DC 20032⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
SHALONDA SMITH,⠀⠀⠀⠀⠀⠀⠀)
5812 Coolidge St.⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀⠀⠀⠀Case No.
Capitol Heights, MD 20743⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
TAKEVA THOMAS,⠀⠀⠀⠀⠀⠀⠀)
5103 Jay Street NE⠀⠀⠀⠀⠀⠀⠀)
Washington, DC 20019⠀⠀⠀⠀⠀)⠀⠀⠀⠀JURY TRIAL DEMANDED
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
BOLATITO AJOSE⠀⠀⠀⠀⠀⠀⠀⠀)
6645 Georgia Ave. NW⠀⠀⠀⠀⠀)
Washington, DC 20012⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀*Plaintiffs*,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
DISTRICT OF COLUMBIA,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
Serve:  Karl Racine⠀⠀⠀⠀⠀⠀⠀)
Attorney General of the⠀⠀⠀⠀⠀)
District of Columbia,⠀⠀⠀⠀⠀⠀)
400 6th St. NW⠀⠀⠀⠀⠀⠀⠀⠀⠀)
Washington, DC 20001⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀*Defendant*.⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

## COMPLAINT

Comes now Plaintiffs, ***Jadonna Sanders*** (hereinafter "Plaintiff Sanders"), ***Shalonda Smith*** (hereinafter "Plaintiff Smith"), ***Takeva Thomas*** (hereinafter "Plaintiff Thomas") and ***Bolatito "Bebe" Ajose*** (hereinafter "Plaintiff Ajose"), by and through undersigned counsel, bringing the instant Complaint for compensatory and injunctive relief against Defendant

1

Washington Metropolitan Department of Fire and Emergency Services (hereinafter "Defendant" or "DC FEMS"), and state as follows:

## INTRODUCTION

Plaintiffs are four African American women firefighters, currently and recently assigned to the Fire Prevention Division of DC FEMS, who allege that they have been systematically and continuously discriminated against on the basis of their race and gender in the terms and conditions of employment, most especially with respect to disparate discipline, pay and promotional practices, and further allege that DC FEMS is a hostile work environment for Black women firefighters, maintaining a custom, pattern and practice of disfavoring Black women firefighters. They further assert that the complaints they made to the DC FEMS EEO office about the way they were being treated were never taken seriously, and were essentially ignored.

As a direct and proximate cause of DC FEMS' long-standing and historic pattern and practice of race and gender discrimination, Plaintiffs have suffered severe mental and emotional distress, and have suffered pecuniary losses for which they seek compensation herein. They further ask the Court for injunctive relief to ensure that current and future Black women firefighters are no longer subjected to disparate terms and conditions of employment. They seek compensatory relief an amount not less than $10,000,000, and for an appropriate ORDER granting the injunctive relief sought herein.

## PARTIES

1.    Jadonna Sanders is an African American woman firefighter who has been with DC FEMS since 2001. At all times relevant, she served as an arson investigator in the Fire Prevention Division. She is a resident of the District of Columbia.

2.      Shalonda Smith is an African American woman firefighter who has been with the DC FEMS since April of 2006.  She currently serves as a Technician Inspector in the Fire Prevention Division, working with hospitals and health care centers.  She is a resident of the state of Maryland.

3.      Bolatito "Bebe" Ajose is an African American woman firefighter who has been employed by DC FEMS since 2001.  She is currently employed as a Fire Inspector and is a resident of the District of Columbia.

4.      Takeva Thomas is an African American woman firefighter who has been serving with DC FEMS since September of 2012.  She is currently serving as a Fire Inspector in the Fire Prevention Division.  She is a resident of the District of Columbia.

5.      Defendant DC FEMS is a department of the government of the District of Columbia, under the leadership of Mayor Muriel Bowser.

## JURISDICTION AND VENUE

6.      This Court enjoys federal question jurisdiction over the claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* ('Title VII"), the Lilly Ledbetter Fair Pay Act, as incorporated into Title VII, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, by way and through 42 U.S.C. § 1983.  This Court enjoys supplemental jurisdiction over all Plaintiffs' state law claims pursuant to the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq.*  Venue is proper in this Court because all acts and omissions in controversy took place in the District of Columbia.

## FACTS RELEVANT TO ALL PLAINTIFFS

7.      In November of 1990, DC FEMS entered into a consent decree and settlement of a class action lawsuit alleging that it had engaged in systemic race discrimination against African American firefighters.   *See Hammond v. Barry*, 752 1087 (D.D.C. 1990) (hereinafter "Hammond").

8.      Specifically, the plaintiffs in *Hammond* asserted that the DC FEMS had a pattern and practice of both disparate treatment of African American firefighters, and maintained promotional practices that had a disparate impact on African American firefighters.

9.      In *Does v. District of Columbia*, 448 F. Supp. 2d 137, 139 (D.D.C. 2006), Defendant entered into yet another settlement in which plaintiffs were determined to be the prevailing party. In that case, a group of women DC FEMS firefighters and Emergency Medical Technicians (hereinafter "EMTs') were forced to take pregnancy tests, and had to have a negative test in order to remain employed.

10.     Those who were pregnant were forced to have abortions to keep their jobs.  The women who were forced to have abortions were only awarded slightly more than $100,000 for what was done to them.

11.     Plaintiffs herein are four people who are currently being victimized by the custom and lingering and ongoing racist and sexist culture of DC FEMS, as African Americans and women.

### I.      STRUCTURE OF DC FEMS

12.     The DC FEMS is broken down into four divisions: Operations Division, Training Division, Fire Prevention Division, and Administration.

13.     The Operations Division is responsible for all of the field operations, including all of the fire stations, trucks and equipment and vehicles.

14.     The Training Division is responsible for the fire academy, and all of the myriad courses and certificates that DC FEMS personnel are required to maintain.

15.     The Fire Prevention Division is responsible for all of community engagement and fire prevention functions. It has three sub-divisions within it: a) Fire Inspection Division -- that does code enforcement, and inspects buildings and things like food trucks for safety compliance; b) Fire Investigations Division -- that investigates fires after they have occurred to ascertain their origins, and also investigates any suspected cases of arson; and c) Public Safety Education Division -- that does community training and engagement to teach fire safety.

16.     The Administration Division includes human resources, office of the fire chief and labor relations, amongst other functions.

## II.     UNLAWFUL DISCRIMINATION IN PAYMENT OF PARAMEDIC PREMIUM

### A.     The Difference Between EMT and Paramedic Certifications

17.     In the past, DC FEMS hired persons who were allowed to be strictly firefighters, and others who did not fight fires and were assigned solely to the Emergency Medical Services (hereinafter "EMS") Division.

18.     Today, all firefighters are required to hold at least some level of emergency medical certification. Many firefighers are also EMTs, but some choose to obtain the higher certification of paramedic.

19.     There is a substantial difference between EMT and paramedic certifications. EMT certification is for the provision of basic first aid in emergency situations, with a focus on stopping bleeding, and keeping a patient breathing until they can be transported to a hospital.

20.     They are often used for patient transfers and dealing with other non-life-threatening injuries and situations. It takes approximately six weeks of training to obtain an EMT certification.

5

21.     By contrast, paramedics have advanced medical training that allows for much more sophisticated life sustaining treatment.

22.     Paramedics are able to administer pain medications and other potent drugs.  It takes three semesters of intense study to become a paramedic, which usually takes more than a year.

23.     Paramedics are required to take several advanced and ongoing training classes to maintain their certifications.  They are deployed to more serious accidents and are used to transfer patients in precarious condition.

**B.     DC FEMS Paramedic Premium Pay Practices**

24.     As a general rule, and in accordance with the Local 36 Collective Bargaining Agreement (hereinafter "Local 36 CBA"), firefighters who have and maintain a paramedic certification, and who meet and maintain the continuing education and recertification requirements, are entitled to a 15% premium to their base pay.

25.     All firefighters who are assigned to the Operations Division receive this premium pay.  The Local 36 CBA makes no distinction for unit members who are assigned to Fire Prevention, Administration or Training, in terms of paramedic premium pay (hereinafter "premium pay").

26.     However, when Plaintiffs Sanders and Ajose were transferred into the Fire Investigations department, they were denied premium pay.

27.     Both the fire investigation and fire inspection departments are considered elite assignments.  They are coveted positions.  There are only five Black women in the Fire Prevention Division, and only four with paramedic certification.

28.     When Plaintiffs achieved those positions, DC FEMS decided that because the Full Time Equivalent (hereinafter "FTE") positions they were filling did not specify a role for persons with paramedic certifications, they would not be entitled to the 15% premium pay.

29.     This decision made no sense, because Plaintiffs were nevertheless required to do all of the work to maintain their certifications so they could be used in the field for overtime assignments.

30.     Overtime opportunities are substantial at DC FEMS, and can dramatically supplement a firefighter's base pay.  In some instances, they can nearly double their salary.  So while the paramedic certification may not be used by inspectors and investigators in their regular work, it is constantly used when they work overtime.

31.     Moreover, Plaintiffs were required to keep up their certifications as a contingency of their appointments to the division, so that they would be able to rely on those skills if they were to transfer out of the Fire Prevention Division, as Plaintiff Sanders eventually did when she was recently promoted to Sergeant.

32.     Thus, the decision to deny Plaintiffs premium pay for maintaining their paramedic certifications was short-sighted, and punitive to them.  By contrast, uniformed firefighters assigned to the Training and Administrative divisions continue to receive paramedic premium pay, even though they too have assignments that do not routinely involve field work.

33.     Importantly, the decision not to provide premium pay to firefighters in the Fire Prevention Division affected a very small group people, the majority of whom were African American, four of whom were African American women.

34.     Despite repeated complaints about this pay practice by Plaintiffs Sanders and Ajose, Local 36 did not pursue a grievance on their behalf, ostensibly because it was such a small group of employees who were affected by the pay practice.

35.     The decision to not pay the paramedic premium to Plaintiffs affected every aspect of their pay and benefits, resulting in a compounding reduction in their overtime pay rate and in the value of their retirement annuity.

36.     In 2019, Plaintiff Ajose filed an EEOC charge, raising a variety of issues including the disparate pay issue. The case went to mediation in 2020, and was ostensibly resolved.

37.     However, rather than providing Plaintiff Ajose and any of the other African American women affected by the disparate practice with back pay and a make whole remedy, DC FEMS decided to pay the affected employees premium pay in lump sum quarterly payments, rather than bumping up their hourly rate.

38.     This disparate practice had a negative impact on their overtime pay rate, and thus caused them to be paid less than their counterparts for the same amount of overtime.

39.     Furthermore, DC FEMS has not been consistent in paying the quarterly premium, and has made no adjustments to Plaintiffs' retirement annuities to reflect the amount of pay they should have earned over the substantial number of years that they were underpaid.

40.     DC FEMS has all but admitted that Plaintiffs were always entitled to the premium pay. It has failed to take appropriate steps to ensure that Plaintiffs were made whole and were properly paid moving forward, and thus violated and voided the terms of the mediation resolution with Plaintiff Ajose.

41.     Plaintiffs continue to be harmed by DC FEMS inequitable pay practices and seek both compensatory and injunctive relief to ensure that they are made whole, including with respect to interest, costs and attorney fees, and to ensure discriminatory pay practices at DC FEMS are discontinued.

### III.    DISPARATE AND RETALIATORY DISCIPLINARY PRACTICES

42.     Plaintiffs assert that DC FEMS holds African American women to harsher disciplinary standards, and forces them to endure years of investigation and disciplinary actions for things that other accepted and not disciplined in other firefighters.

43.     While DC FEMS has written policies, firefighters learn the methods of conduct in the field in their training and from working with more senior and seasoned firefighters. These common norms become so widely practiced that they become the standard of operations.

44.     However, DC FEMS, occasionally chooses to hold some firefighters to the letter of the rule and to discipline them, while looking the other way with respect to all other firefighters.

45.     With respect to Plaintiffs Ajose, Smith and Thomas, DC FEMS sent them to disciplinary review boards for actions that were either not violations or were technical violations, while not subjecting any other firefighters to the same standards.

46.     Importantly, firefighters who are subjected to long-lasting investigations lose promotional and developmental opportunities, and substantial pay because they lose their entitlement to holiday pay and overtime pay, while their case is pending.

47.     Thus, subjecting firefighters to frivolous and baseless disciplinary actions drastically affects their income and causes permanent injury to their pension annuities.

48.     DC FEMS has a pattern and practice of using disciplinary actions to silence and retaliate against African American women who complain about mistreatment, and did so to all Plaintiffs herein.

## IV.   DISPARATE AND UNFAIR OVERTIME ASSIGNMENT PRACTICES

49.     In the Fire Prevention Division, overtime is tracked and assigned through the KRONOS system (hereinafter "KRONOS").

50.     There is a calendar in KRONOS to which all persons who volunteer for overtime have access, and in which they are able to seek and sign up for overtime assignments.

51.     The Local 36 CBA requires that overtime be equalized as much as possible, amongst those who seek it, because unfair overtime assigning results in substantial disparities income.

52. Theoretically, in order to equalize overtime opportunities, overtime is assigned in reverse order of the overtime hours a person has already worked. So the person who has the worked the least overtime, is given the highest priority for the next overtime assignment.

53. As can be expected, some people covet overtime work, while others may seek it infrequently. And, as can be expected, there are occasions when there is a need for people to work mandatory overtime.

54. In the Fire Prevention Division, overtime assignment decisions were made by Lieutenant John Barnes (hereinafter "Lt. Barnes"). While there were overtime assignment policies in place, Lt. Barnes had the authority and discretion to override polices, and hand out overtime opportunities to his preferred employees.

55. For several years, Lt. Barnes manipulated the overtime assignment system to give himself excessive overtime hours, and consistently denied overtime opportunities to Plaintiffs.

56. Despite multiple complaints, Lt. Barnes was allowed to continue unfairly manipulating the overtime assignment system to disadvantage the few Black women inspectors and investigators in the division, and to give repeated and excessive overtime hours to his preferred inspectors, all of whom were men.

57. In 2021, an Inspector General investigation was launched into DC FEMS overtime practices because of suspected fraud and abuse of the system, and upon information and belief, that investigation is ongoing.

58. Plaintiffs assert that they are entitled to a make whole remedy to compensate them for lost overtime opportunities, and the effect such lost wages had on their retirement annuities.

## V.     IGNORING AND MARGINALIZING COMPLAINTS FROM BLACK WOMEN

59.     DC FEMS has a pattern practice and culture of ignoring the complaints of African American women firefighters.

60.     Plaintiffs are all long-tenured firefighters, serving in an elite unit, and have proven their worth to the organization for years.

61.     Despite that fact, when they raised complaints about the way they were being paid, and despite the union sometimes assisting them in pursuing those claims, their complaints were ignored and marginalized.

62.     DC FEMS had the capacity to correct its unfair and unlawful pay practices years before it eventually did so.  It should not have taken more than five years to respond to Plaintiffs' complaints.

63.     Plaintiffs assert that they observed their non-Black colleagues raise concerns and be responded to in a timely fashion.  This contrasted sharply with the fact that Plaintiffs would send emails up the chain of command, and receive no acknowledgement or response of any kind.

### FACTS RELEVANT TO PLAINTIFF SANDERS

64.     When Plaintiff Sanders was first hired by Defendant in 2001, she was assigned to the 3rd Battalion, which was predominantly Black.  For the most part, she was able to learn and work in the 3rd Battalion.

65.     In November of 2007, Plaintiff Sanders was singled out for discipline, and was subjected to harsher discipline than her colleagues related to an incident in which she was not the culprit.

66.     Plaintiff Sanders and several other firefighters were witnesses to an altercation that took place between an African American firefighter and a white fire official.  There were two fire crews

that witnessed the altercation, and all of the witnesses were asked to submit a written report about what they had observed.

67.     The black male firefighter had already reported harassment from the white officer to his superiors, but nothing was done about his concerns. Plaintiff Sanders was part of a crew that had been dispatched to a fire, and when they were preparing to go back in service, the official and the Black firefighter exchanged words.  The white official accused the firefighter of spitting on him during the altercation.

68.     DC Metropolitan Police (hereinafter MPD) was called in to investigate, but no criminal charges were filed against the black firefighter.

69.     DC FEMS launched an investigation into the matter, and Plaintiff Sanders submitted a written report of what she saw, as did the other members of her crew.  The other crew that was asked to submit statements was predominantly white.

70.     For reasons that were never explained, DC FEMS disbelieved the reports of both Plaintiff Sanders and of the other members of her crew, who denied that the Black firefighter had spit on the white official.

71.     Plaintiff Sanders was sent to a Deputy Chief disciplinary panel, which can carry up to 120 hours of suspension, but the male firefighter on her crew, who saw the same thing and made essentially the same written report as Plaintiff Sanders did, was sent to a Battalion Level disciplinary panel, that could only give up to 72 hours of suspension.  DC FEMS never explained the disparity in the level of discipline.

72.     Plaintiff Sanders was found guilty and suspended for 12 hours, but her male colleagues' charges were dismissed, even though their reports were virtually identical.

73.     The predominantly white crew was believed over the Black crew, but when the black firefighter who was accused in the altercation went to his own trial board, the trial board concluded that one of the members from the predominantly white crew had submitted false information.

74.     The Black firefighter was found not guilty of spitting, but was held accountable for a lesser offense.   Thus, Plaintiff Sanders' account was eventually found to be accurate, however her suspension was not reversed.

75.     In 2009, Plaintiff Sanders was transferred to the Fire Prevention Division as an investigator. From the time she got there, she was treated as an unwelcome interloper.

76.     In August 2009, Plaintiff Sanders' and fellow Black female firefighter Jackie Cole (hereinafter "Investigator Cole") were confronted by an investigator, Scott Ford (hereinafter "Investigator Ford") (white male) who said to them "I'm not here to fuck you, and not here to fuck over you," or words to that effect.

77.     The comment was so hostile, presumptuous and inappropriate that both Plaintiff Sanders and Investigator Cole reported it to the EEO Department.   Despite their complaints, no action was taken against Investigator Ford, and no additional training or counseling was implemented in the division to ensure such inappropriate comments did not happen again.

78.     From the inception of her training in the Fire Investigations unit, Plaintiff Sanders was also subjected to disparate and less advantageous training and development opportunities.

79.     For example, in February 2010, Plaintiff Sanders was counseled by her supervisor, Sgt. David Slye (hereinafter "Sgt. Slye") because she had not completed her fire investigation hands-on training.

80.     The issue, however, was not of Plaintiff Sanders' making.   At the time, Plaintiff Sanders' training officer, James Taylor (hereinafter "Investigator Taylor") worked an 8 hour shift from 6:00

13

am to 2:00 pm, but Plaintiff Sanders was assigned to a different shift.  Thus, whenever she was working and a fire occurred, her training officer wasn't at work.

81.    From December 2009 to March 2010, Investigator Taylor was only present three times to evaluate Plaintiff Sanders.

82.    Plaintiff raised the issue of being on a different shift than her training supervisor several times, and even asked to be trained by a field training officer who worked shifts similar to her own.

83.    Instead of listening to Plaintiff Sanders' concerns, Defendant ignored her for months, and then ultimately counseled her, not Investigator Taylor, for there being insufficient training and observed activities for her to learn the job, and be properly evaluated in doing it.

84.    In May of 2011, Defendant took away Plaintiff Sanders' department-issued phone, ostensibly because she did not answer the phone on her day off.

85.    At the time, firefighters were not required to answer department-issued phones on their days off, and no other firefighters were reprimanded for that alleged transgression.

86.    Plaintiff Sanders was the only firefighter Defendant singled out for not answering her phone on her day off.  Unlike some other employees, Plaintiff Sanders was an hourly/scheduled employee, not an on-call employee. So not only was there no expectation for her to respond to calls during her days off, but she was not compensated for being in an on-call status.

87.    Throughout her tenure, Plaintiff Sanders was subjected to disparate rules and procedures than her colleagues.  For example, in 2011, she was verbally scolded when she helped paramedics resuscitate a 4 year-old child.

88.    Plaintiff Sanders was dispatched as the investigator to a serious fire, while she was working overtime.  She arrived on scene quickly, and the paramedics there were calling for help.

14

89.     Plaintiff Sanders volunteered to help because she was a trained paramedic, and helped them with the victims of an apartment fire.  Her actions were brave and completely appropriate in the circumstances.

90.     Unlike two white male firefighters who were treated as heroes for helping paramedics drive victims of an accident to the hospital just a few weeks prior, Plaintiff Sanders was told that it wasn't her "responsibility" to help save the life of a child.

91.     Instead of being celebrated like her white colleagues, she was forced to write an incident report, after having worked for 27 hours straight, as the only fire investigator on the shift.

92.     Another example of this was in 2011, when Plaintiff Sanders was denied the right to work overtime outside of the Fire Investigation Unit without prior written approval.

93.     This prohibition had a very serious impact on Plaintiff Sanders' earning capacity, because most of the overtime opportunities were in the Operations Division and in the field, not in the special and administrative divisions.

94.     It bears repeating that at the time, there was no general policy that prohibited cross-division overtime, and it was the common practice for those in the special divisions and administration to regularly work overtime in Operations without having to seek permission.

95.     Plaintiff Sanders was the only employee at the time who was required to ask permission to work overtime.

96.     Plaintiff sent repeated correspondence to her chain of command asking why she was the only firefighters required to obtain prior approval to work overtime.  Despite her repeated inquiries, she never received a response, explanation or justification for the disparate treatment she was subjected to.

97.    In another example of disparate treatment, Plaintiff Sanders had requested to attend the police academy to obtain the training to be granted police powers to investigate arsons. Attending the police academy was a requirement of the fire investigation unit. It is a coveted certification and allows fire investigators to broaden their investigatory jurisdiction.

98.    Plaintiff Sanders met all the requirements to go to the Police Academy, but for unspecified reasons, was denied the right to attend.

99.    According to DC FEMS policy and MPD policies, a person denied access to training at the police academy is supposed to be notified of the reasons for such denial in writing. Plaintiff Sanders was never given any reason, let alone in writing.

100.    Plaintiff Sanders made several written complaints about denial of access to the police academy, and DC FEMS' absolute refusal to give her a written explanation for the denial.

101.    As Plaintiff's demands for an explanation escalated, she was told that there was something in background check that justified the denial, but was never given the written explanation that was given to others.

102.    DC FEMS' refusal to give Plaintiff Sanders a written explanation as to what was blocking her access to the police academy not only cut her off from an important job development opportunity, it made it impossible for her to appeal the decision, or fix whatever the issue was.

103.    As Plaintiff Sanders' concerns about the way she was being singled out and mistreated increased, in May of 2014, she requested her personnel records through a FOIA request.

104.    Defendant never sent Plaintiff Sanders' records to her, and tendered no explanation as to why it was denying her FOIA request. It simply pretended as if her request was of no consequence, and refused to address it. Again, Plaintiff Sanders repeatedly raised questions and concerns to her superiors, but she was ignored.

105.   In 2016, Plaintiff Sanders posted a comment on her social media page lamenting the election of Donald Trump.  Specifically, she bemoaned that John Hinkley was not around when he was needed, or words to that effect.

106.   Importantly, she did not even intimate that she would take actions like John Hinkley, or that anyone else should.

107.   Plaintiff Sanders had a First Amendment right to make such a comment on social media, and while some may have been offended, it was a far cry from any sort of direct threat to Mr. Trump.

108.   However, because of the animus and bias of Defendant's leaders, Plaintiff was referred to the Secret Service and involuntarily transferred from the Fire Investigations Division.

109.   In theory, Plaintiff Sanders was transferred because Defendant did not want her to enter any federal buildings.  In reality, there was a far greater chance of Plaintiff entering a federal building while in operations, which responds to fires all over the city, than in fire investigations that does not have jurisdiction to investigate fires in federal buildings.

110.   In essence, Plaintiff Sanders was transferred in retaliation for posting her political opinions, but was not disciplined for violation of any departmental policy or rule.

111.   She grieved the involuntary transfer, and after a two-year ordeal, prevailed, being reinstated to her position.

112.   Although she was exonerated of any wrongdoing, and was not found to have violated any policy, Plaintiff Sanders was placed in a desk job, denied field opportunities, and barred from federal buildings as a punishment for expressing an opinion her superiors did not like.  She was also not made whole for the lost pay and overtime opportunities.

113.    Interestingly, Plaintiff Sanders has been part of both Vice Presidential and Presidential details while in the Fire Prevention Division, and has cleared all the necessary background checks to fulfill her duties.

114.    Plaintiff Sanders was treated disparately again, when she was referred to EEO counseling because she was overheard stating to a colleague that, in her opinion, the military is racist.

115.    Again, Plaintiff had a First Amendment right to express her opinion about the military. Moreover, for generations, scholars and experts on racism in the military have corroborated Plaintiff's opinion.

116.    Defendant sent Plaintiff to EEO for stating an opinion, for the express purpose of intimidating and silencing her, and sending a message to others that raising issue of systemic racism will be cause for retaliation from management.

117.    In 2019, Plaintiff Sanders was again denied a career development opportunity when, for months, she asked to be trained to work on the barge that is used during large fireworks displays.

118.    Lt. Barnes allowed a white male firefighter to be trained on the barge who had substantially less seniority than Plaintiff Sanders, in both technical work and in years of service, which was against policy and against the terms of the CBA.

119.    When Plaintiff Sanders confronted Lt. Barnes about the unfair way she was treated, Lt. Barnes relented, but required that in order for Plaintiff Sanders to be trained on the barge, she would have to come in on her days off, and not be paid during that time.

120.    Again, this requirement was reserved for Plaintiff Sanders.  The white male who was trained on the barge, and the other firefighters who were so trained, were not required to be unpaid and to lose leave time to do so.

121.   In 2020, Lt. Barnes dropped Plaintiff Sanders' performance rating, asserting that she needed to improve her attendance. However, during that year, Plaintiff Sanders was approved for several hours of paid, statutorily protected family leave.

122.   Moreover, there were other employees in the division who took family leave, and who had more days off than Plaintiff Sanders did, who were not knocked for doing so. In this, Plaintiff Sanders was again treated disparately than her colleagues.

123.   In March of 2020, as most of DC was dealing with the COVID pandemic, Plaintiff Sanders requested new uniforms because her pants were too small for her, and very uncomfortable.

124.   Plaintiff Sanders had already received a uniform voucher prior to the pandemic quarantine, but the voucher had expired. Rather than just reissuing the voucher, Plaintiff Sanders was forced to wear pants that were very ill-fitting and uncomfortable, which was completely humiliating to her.

125.   There was absolutely no reason to blame or punish Plaintiff Sanders for the voucher expiring when all non-essential operations were being shut down, and most employees were not going to work. The delay in being able to turn in the voucher for new uniforms was not of Plaintiff Sanders' making.

126.   In September of 2020, Plaintiff received an email from Battalion Fire Chief (hereinafter "BFC") Hamm to go to logistics and retrieve her firefighting gear.

127.   When Plaintiff Sanders and another female firefighter got to the location, they informed that firefighter Dominic Nicholson (hereinafter "firefighter Nicholson") that they were there to pick up gear.

128.   Firefighter Nicholson told BFC Jon Grover (hereinafter "BFC Grover") that the two women were there to pick up gear. BFC Grover immediately started yelling in a very loud and

frightening tone, demanding that the two women "get out and don't come back there," or words to that effect.

129.     The two women left, shaken by the confrontation. When they were in the car, BFC Hamm called and told them to go back into the building to pick up the gear. BFC Hamm had to send an email to BFC Grover explaining what the women were doing there, but no disciplinary action or counseling was taken to address BFC Grover's hostile, aggressive and loud yelling at the women.

130.     When Plaintiff Sanders got back to the office, she wrote a special report about BFC Grover's obnoxious and disrespectful behavior, and when she spoke to BFC Hamm about the special report, BFC Hamm said "that is how he is," or words to that effect. Again, Plaintiff Sanders' complaints were marginalized and ignored.

131.     On or about November 6, 2020, Plaintiff Sanders sent BFC Hamm an email requesting to meet with him. When she met with him, Plaintiff Sanders told him that each and every woman that Lt. Barnes commanded, had a problem with him, and further complained that BFC Grover was also treating women firefighters unfairly and disparately.

132.     During the conversation, BFC Hamm agreed that there were real problems with Lt. Barnes' management of the women firefighters in the Fire Prevention Division, but BFC Hamm refused to take any corrective action.

133.     Rather than taking the concerns raised by Plaintiff Sanders seriously, Defendant counseled Plaintiff Sanders for being "sarcastic" because some of the words in her complaining email were in all caps.

134.     Feeling frustrated by the total lack of concern and action by BFC Hamm, on or about November 6, 2020, Plaintiff Sanders sent Amy Mauro (hereinafter "Ms. Mauro") who was the

acting EEO officer at the time, an email about the hostile work environment for women that was being created by Lt. Barnes.

135.    On or about November 13, 2020, Ms. Mauro responded to Plaintiff Sanders, stating that she would discuss the problems Plaintiff Sanders was having with Lt. Barnes with the new incoming EEO officer.

136.    Plaintiff Sanders later emailed EEO Counselor Kenneth Hunter (hereinafter "Mr. Hunter"), and again, her complaints were ignored.  Mr. Hunter never interviewed Plaintiff Sanders, asked for any of her corroborating evidence or launched any formal investigation.

137.    Plaintiff Sanders expected that, at least, the Division would do more gender equity training. Even that did not occur.

138.    However, at no point did the incoming EEO officer reach out to Plaintiff Sanders.  For months, no one in EEO actually processed Plaintiff Sanders gender discrimination complaint, or investigated it in any way.

139.    In late 2020, Plaintiff also began to complain about the fact that she was not being paid the 15% premium for holding a paramedic certification.  Like her Black female colleagues, she was told that there was no FTE in the investigations unit specifically for a firefighter with paramedic qualification.  The explanation made no sense, as it was entirely a matter of DC FEMS' choice to create the FTE if they so desired.

140.    For years, Plaintiff was not properly compensated for doing the work necessary to maintain her paramedic certification and being available to DC FEMS for overtime assignments.

141.    In 2021, DC FEMS realized that Plaintiffs Sanders and Ajose were correct in their assertion that they should have been paid the premium, and began to pay them the premium.  But unlike

other employees who obtain the premium in their regular bi-weekly pay checks, Plaintiffs Sanders and Ajose were paid in a quarterly lump sum payment that negatively impacted their hourly rate.

142. Plaintiff Sanders asserts that she is still being paid in a way that is disparate and negatively impacts her retirement and hourly wage rate.

143. Plaintiff Sanders also raised a complaint against Lt. Barnes for unequal distribution of overtime. Because Plaintiff Sanders was in an administrative role in the Fire Investigations department, she was able to see who was being assigned the most overtime.

144. Based on her observation, Lt. Barnes was assigning himself the most overtime, and disproportionately assigning overtime to male firefighters he preferred. More specifically, Lt. Barnes was not abiding by the union contract in assigning overtime in a way to equalize it amongst those who sought it.

145. Plaintiff Sanders' complaint brought direct scrutiny upon Lt. Barnes, which in turn, caused him to retaliate against Plaintiff Sanders.

146. Lt. Barnes retaliated against Plaintiff Sanders by making her do fire inspections on food trucks and other buildings, something that is not part of the investigative function, and something no other fire investigator was required to do.

147. To date, there has been conclusion to the investigation into misappropriation of overtime, and violation of overtime equalization rules.

148. Plaintiff Sanders has not been compensated or made whole for the overtime opportunities she lost while in the fire investigations unit.

149. Plaintiff Sanders was promoted to Sergeant in 2021 and has since transferred to the operations division.

150.   Despite transferring division, Plaintiff Sanders is still being treated disparately and unfairly. For example, new sergeants are supposed to go to an intensive training to help them with their new duties.

151.   Although Plaintiff Sanders had more seniority and was higher on the promotion list than another white male had been promoted more recently, the white male was placed in the training class.

152.   To the point that it was Plaintiff Sanders on the promotion list, DC FEMS placed promotes in the training course in order of their name on the list.  When they got to Plaintiff Sanders, they skipped over and put someone substantially lower on the list than her in the training.  No explanation was ever offered for this patently unfair decision.

153.   Plaintiff Sanders asserts that Lt. Barnes was motivated by gender animus in treating her and the other women in the Fire Investigations unit disparately than their male counterparts.

154.   Plaintiff Sanders asserts that her complaints about Lt. Barnes and others were ignored by upper management because they do not listen to, or value Black women firefighters.

155.   Throughout her career, Plaintiff has been subjected to disparate treatment, disparate pay, disparate training opportunities, unfair and disciplinary action and retaliation.

## FACTS RELEVANT TO PLAINTIFF AJOSE

156.   Plaintiff Ajose joined DC FEMS in 2001, and was subjected to a horrific act of gender discrimination by DC FEMS.

157.   Plaintiff Ajose, and all of the women in her firefighters class were required to take a pregnancy test, and those who were positive were given the choice to terminate their pregnancies or lose their employment.

158.   Plaintiff Ajose was one of four women who terminated their pregnancies in order to keep her employment.  She is the only one who is still employed by DC FEMS.

159.   Although she and the other four entered into a settlement agreement with DC FEMS in 2012 pertaining to the extraordinarily discriminatory and unconscionable actions of DC FEMS, to this day, Plaintiff Ajose is still suffering from extreme emotional distress from what she was forced to do against her will.

160.   As a result of the "me too" movement, and the current political environment in which there have been substantial discussions about a woman's right to make her own reproductive choices, Plaintiff Ajose is being forced to reexperience the trauma of having her reproductive choice taken away from her by DC FEMS.

161.   Plaintiff Ajose's trauma is currently compounding the severe mental stress and emotional anguish she is currently enduring as a result of the ongoing and continuous gender and race discrimination she is experiencing at DC FEMS.

162.   In 2007 Plaintiff Ajose was detailed to the Training Division as a lead EMT instructor, because DC FEMS has been sued due to an in improper response to a New York Times journalist who had been beaten in DC.

163.   As a result of the settlement, DC FEMS was required to train substantially more emergency personnel and needed help with EMT training and the new certification that was required as part of the settlement.

164.   Plaintiff Ajose remained in the training division until 2015.  To her credit, she had a higher EMT exam pass rate for her students than any other instructor.

165.   In 2015, Plaintiff Ajose went to the Fire Prevention Division as a fire inspector, which was a promotion.  She also became a certified paramedic in the District of Columbia in the same year.

166.    In 2017, Plaintiff Ajose was detailed back to the training division because DC FEMS was in need of strong instructors, due to the number of Black women recruits who were failing EMT training.

167.    In 2017, despite her strong track record in training recruits, and the significant improvement in Black women getting through the EMT training because of her help, Plaintiff Ajose was subjected to grossly unfair and inappropriate discipline.

168.    One of the students who repeatedly failed the EMT training filed a complaint against Plaintiff Ajose, alleging that Plaintiff Ajose was receiving gifts from other students for giving them help.

169.    Specifically, the failing student asserted that Plaintiff Ajose received "food" from students in the class in order to get the attention and support they needed.  Importantly, the accuser did not accuse any of her classmates of improper behavior, nor did she provide any names or examples of such alleged *quid pro quo*.

170.    The student repeatedly failed the EMT training, and was ultimately fired from DC FEMS after having been fired once before, being given a second chance to succeed, and failing again.

171.    Rather than treating the complaint as it treated other complaints, DC FEMS sent Plaintiff Ajose to a trial board, one of the most serious and impactful disciplinary steps, to defend herself and her actions.

172.    Although Plaintiff Ajose successfully defended herself, and was fully exonerated, the episode was deeply disturbing, and very disruptive to her because she could not be given any overtime assignments while under suspicion.

173.    Upon information and belief, no other DC FEMS firefighter has ever been sent to a trial board because a student they were instructing failed training.

174.   As point of reference, Plaintiff Sanders was assigned to a trainer who was on a completely different shift, and no person took any responsibility for ensuring she would be given the help to succeed.  Not only was no one sent to a trial board, no DC FEMS personnel were even counseled for that dereliction.

175.   Plaintiff Ajose asserts that she was sent to trial board because of her race, African American and because of DC FEMS's longstanding pattern, practice and custom of subjecting Black female firefighters to far harsher discipline than their white counterparts

176.   In 2017, Plaintiff Ajose was one of six firefighters who made the cut for promotion to arson investigation, and six people were successful with the written exam.  Plaintiff Ajose was the only female who scored well enough to advance.

177.   DC FEMS chose to select four males for promotion, and refused to promote Plaintiff Ajose.

178.   Importantly, DC FEMS normally publishes a promotion list, or "registrar" that shows who made the cut for promotion and places them in order.

179.   In 2017, however, DC FEMS did not create a test result registrar, as it has done for every other testing cycle.

180.   DC FEMS failed to post the list that showed a Black woman as one of the highest test takers. DC FEMS promoted 4 men, and then closed down promotions altogether, despite there being two openings due to retirements, rather than promoting Plaintiff Ajose.

181.   In 2021, when Plaintiff Ajose took the test again, she was at the bottom of the list, and DC FEMS posted that registrar.

182.   Throughout her career, Plaintiff Ajose was disparately than her colleagues.  For example, in 2018, Plaintiff Ajose paid out-of-pocket for an arson investigation course that was directly relevant to her fire investigation duties.

183.    When she asked DC FEMS to reimburse the expense, Defendant denied her request, even though it paid for the class for four different men, and reimbursed them even though, unlike herself, they not need the class for their duties.

184.    Despite multiple complaints, Plaintiff Ajose was given no explanation as to why she was treated differently than the men who were reimbursed for the course.

185.    Plaintiff Ajose has also been affected by Lt. Barnes' improper and unfair distribution of overtime.  Along with Plaintiff Sanders, Plaintiff Ajose raised the issue, demanding that DC FEMS implement the overtime equalization requirements of the CBA.

186.    Plaintiff Ajose further complained about the disparate pay practices of DC FEMS that only affected African American employees in the Fire Prevention Division.  To this day, Plaintiff Ajose has not been made whole as to the disparate pay practices of DC FEMS.

187.    Specifically, Plaintiff Ajose, like her colleagues was entitled to 15% premium pay for holding a paramedic certification.

188.    Plaintiff Ajose entered into a mediated settlement about her claim for premium pay, but DC FEMS has violated the terms of the settlement by not paying Plaintiff Ajose in accordance with its terms, and not making Plaintiff Ajose whole for losses to her retirement, and the effect on her overtime pay.

189.    Plaintiff is also still being retaliated against for engaging in protected activity in opposing and protesting DC FEMS's disparate treatment of Black women firefighters.

## FACTS RELEVANT TO PLAINTIFF SMITH

190.    Plaintiff Smith joined DC FEMS in April of 2006.  In November of that year, she was assigned to Engine 24.

191.    In 2006, Plaintiff Smith was subjected to inappropriate touching and hostile and intimidating behavior from white male firefighters who repeatedly and intentionally bumped her with their shoulders in order to push and bully her.

192.    Shortly thereafter, the same firefighters who were bullying Plaintiff Smith, sabotaged equipment that she needed and would use in fighting a fire.

193.    When Plaintiff Smith complained about what was being done to her, and the fact that it was placing her life at risk, DC FEMS moved her to another assignment, but took no action against the white male firefighters who bullied and intimidated her.

194.    Plaintiff Smith filed an EEOC charge related to the race and gender based bullying, harassment and intimidation, but DC FEMS refused to participate in the investigation. Although Plaintiff Smith intended to pursue her rights in court, she unfortunately lacked the financial resources at the time to do so.

195.    In 2008, she was transferred to Engine 32, and remained on that team until 2012. In 2012 she was transferred to the Truck 8, and remained there until 2016.

196.    In March 2010, Plaintiff Smith and firefighter Donald Steele (hereinafter "Firefighter Steele")(African American male) were sent to a trial board for termination, because they were accused of violating policy in not being available for an emergency call. Essentially, Plaintiff Smith and Firefighter Steele had failed to put themselves as available for service when they were in the general vicinity of an emergency call.

197.    While Plaintiff Smith and Firefighter Steele acted in a manner that was completely consistent with the common practices at DC FEMS, management decided to make an example of them, and targeted them for termination. This was the first disciplinary action against Plaintiff Smith in her career.

198.    In a way that was demonstrative of animus, DC FEMS charged Plaintiff Smith and Firefighter Steele with multiple violations and pushed assertively for them to be discharged.

199.    At the trial board, Plaintiff Smith was found guilty of only two charges, which were the most minor charges against her.  However, she was sentenced to 168 hours of suspension, an extraordinary amount for the transgression at issue.

200.    Plaintiff Smith  was forced to appeal the decision *pro se* to the Office of Employee Appeals (hereinafter "OEA"), and an Administrative Law Judge (hereinafter "ALJ") found that whether or not Plaintiff Smith was guilty, the fact that DC FEMS' disciplinary action was so disparate as compared to the discipline other firefighters for similar transgressions, that the discipline could not be sustained.

201.    In finding for Plaintiff Smith, and against DC FEMS, the ALJ concluded:

> "The inconsistent findings by the Fire Trial Board, as it relates to charge two against [Plaintiff Smith] and Firefighter Steele, exemplify the disparate treatment [Plaintiff Smith] received by Agency. Agency does not offer any reason for imposing different penalties for [Plaintiff Smith] than Firefighter Steele, despite providing the same information regarding the status and location of A-32 on the evening of March 30, 2010.  As such, the penalty imposed against [Plaintiff Smith] for charge two, providing false and misleading information to Agency, must be reversed."

EXHIBIT 1.

202.    The ALJ's decision noted in several places the way in which Plaintiff Smith was treated disparately than her male colleague, and further noted that DC FEMS had no explanation or excuse for its behavior.  *See id.*

203.    The ALJ also noted that both Plaintiff Smith and Firefighter Steele were severely disciplined for actions that were common at DC FEMS, and found that the Agency's lack of explanation for why it singled them out required reversal of the discipline. *See id.*

204.    DC FEMS appealed the ALJ decision to the full board and lost the appeal. It was therefore required to pay Plaintiff Smith her entire back pay and make her whole.

205.    Instead, DC FEMS told Plaintiff Smith that they were going to appeal the OEA final decision to the D.C. Court of Appeals. It did not do so, however, and it is far too late for DC FEMS to do so now.

206.    It took more than two years for Plaintiff Smith's disciplinary case to be resolved. To date, DC FEMS has failed to pay Plaintiff Smith the backpay and make whole award she is entitled to, and still owes her that sum.

207.    Plaintiff Smith asserts that she was treated disparately than her colleagues because of her race and her gender.

208.    In 2011, while Plaintiff Smith was dealing with her disciplinary matter, she became pregnant. Over her objection, DC FEMS forced her to go to the Police and Fire Clinic (hereinafter "PFC"), to inform them of her pregnancy.

209.    When she went there, PFC forced her to take a light duty assignment against her will. They then informed Plaintiff Smith that after her 30th day on light duty, they were going to force her to take her own leave to remain in a paid status.

210.    Plaintiff Smith had no choice but to comply, but because she had not been on the force long enough to accrue substantial leave, she would have exhausted all of her leave and still not have enough to cover her pregnancy.

211.    Therefore, her fellow firefighters began to donate leave to her. However, approximately a month before Plaintiff Smith delivered her son, DC FEMS told her that she had maxed out on the amount of donated leave she could have, and that she would be in an unpaid status during the remainder of pregnancy and maternity leave.

212.   Plaintiff Smith was forced to reach out directly to the Fire Chief to address the problem because of its detrimental impact on her income, but in violation of departmental policy that requires response to the Expedited Special Report that Plaintiff Smith submitted to the Chief, she received no response.

213.   Despite Plaintiff Smith's repeated, and concerted efforts to change DC FEMS' sexist and unlawful policy, management refused to budge until Local 39 went to the media to shame DC FEMS management into changing its stance.

214.   However, no remedy was provided to Plaintiff Smith for the anxiety, stress and potential harm to her unborn child that she was forced to endure for no cognizable, rational reason.

215.   Eventually DC FEMS saw the err of its ways, and paid Plaintiff Smith her lost leave, but to this day, it has failed to make her whole.

216.   In 2016, Plaintiff Smith was promoted to the position of Geographical Inspector in the Fire Prevention Division, and in 2018, she was promoted again to Technician Inspector for the Healthcare team.

217.   As a Technical Inspector, Plaintiff Smith works with hospitals and medical centers to ensure they comply with fire safety and prevention regulations.  She currently remains in that role.

218.   Like her fellow firefighters, Plaintiff Smith sought overtime opportunities in order to supplement her income.

219.   However, like the other Black women in the Fire Prevention Division, Plaintiff Smith was consistently and habitually denied overtime opportunities by Lt. Barnes, who was giving himself excessive overtime, and preferentially assigning overtime to male firefighters in the division.

220.    Like the other Plaintiffs herein, Plaintiff Smith repeatedly complained to her superiors that Lt. Barnes was discriminating against the women in the Fire Prevention division, and like the other Plaintiffs, her complaints were ignored by DC FEMS management.

221.    Plaintiff Smith asserts that she has been subjected to retaliation by Lt. Barnes for her complaints against him, and that DC FEMS has failed to take appropriate corrective action to ensure that all personnel in Fire Prevention Division are treated equitably.

222.    Plaintiff Smith has lost wages, career development opportunities, and her pension annuity has been negatively affected by Lt. Barnes' actions, and by DC FEMS refusal to intercede or make her whole.

## FACTS RELEVANT TO PLAINTIFF THOMAS

223.    Plaintiff Thomas began her DC FEMS career in October of 2012.  She was first assigned to the Engine 26 and was promoted to be Fire Investigator in the Fire Prevention Division in September of 2020.

224.    She is also a certified EMT, and has held her EMT certification since 2012.

225.    Like many firefighters in the Fire Prevention Division, she often volunteered for overtime assignments in the field to supplement her income.  When she worked overtime, she often had to rely on her EMT knowledge and skills.

226.    As part of their duties in the field, firefighters often provide transportation for people who are injured to area hospitals.

227.    As part of the transfer of the custody of the injured or ill person, DC FEMS personnel hand over documentation of the medical treatment that was provided by EMTs over to hospital

personnel, and a hospital employee, usually a receiving or charge nurse, signs that they have received the injured person.

228.    For decades, it has been a common practice by DC FEMS personnel to sign for a receiving nurse or staffer when there is high operational tempo in an emergency room.

229.    Plaintiff Thomas learned about this practice when she first started doing field calls in 2012, and has observed many DC FEMS personnel sign in such a manner during her tenure.

230.    Plaintiff Thomas herself has signed over persons she had transferred by emergency vehicle dozens of times in her career, without comment, incident or reprimand.

231.    On or about April 27, 2021, Plaintiff Thomas was working an overtime assignment when she signed a transport over to the hospital, as she had done many times before, and as her colleagues have done frequently.

232.    However, this time Captain Nicole Liriano (hereinafter "Cpt. Liriano) (white female) who was assigned to the day shift at the time because she was under investigation, noticed what Plaintiff Thomas had done, and accused Plaintiff Thomas of forging a nurse's signature.

233.    When Plaintiff Thomas was asked about the incident, she admitted that she had signed the document, but also pointed out that this is a common practice amongst DC FEMS personnel, and if the department wanted to crack down on the practice, it should do so for everyone, not just her.

234.    Despite her explanation, and Defendant's knowledge that disciplining Plaintiff Thomas for doing something that is a common practice would be disparate and inconsistent with its treatment of others, DC FEMS referred Plaintiff Thomas to a trial board for consideration of termination.

235.    For more than a year, while the disciplinary process was underway, Plaintiff Thomas was denied the ability to work overtime, was limited in her duties and endured the stress of potentially losing her employment.

236.    At the time that Plaintiff Thomas was being disciplined, her colleague Plaintiff Ajose, and fellow Fire Prevention employee Plaintiff Sanders, had been consistently complaining about race and gender discrimination in the Fire Prevention Department, and complaining about the treatment of Black women in the division.

237.    Although Plaintiff Thomas was not a complainant herself, she was one of only five Black women in the division, and often perceived to be friendly with the other two complainants.

238.    Plaintiff Thomas asserts that she was targeted for excessive, unwarranted and unjustified disciplinary action because of her race and gender, and because of the retaliatory animus of DC FEMS personnel against Black women in the Fire Prevention Division who were complaining about the way they were being treated.

239.    Despite Plaintiff Thomas' repeated complaints to management that she was being singled out and treated disparately than her colleagues, on or about January 27, 2022, she was sent to a trial board for termination.

240.    Plaintiff Thomas was represented by Local 39 at the trial Board, and after the entire presentation, was only given a reprimand for the transgression.  This was the first reprimand that Plaintiff Thomas has ever received.

241.    Plaintiff Thomas asserts herein that she was targeted for harsh disciplinary action because of Defendant's animus towards Black women firefighters, and in retaliation for the Black women firefighters in the Fire Prevention Division raising concerns about DC FEMS' pattern and practice of disparate treatment against them.

## CLAIMS

## COUNT I

*(On behalf of all Plaintiffs)*

**(Violation of 42 U.S.C. Section 1981 enforced via Section 1983
Based on a Violation of the Fifth Amendment to the Constitution as
Applied to the District of Columbia)**

242.    Plaintiffs reference and incorporate all of the allegations in the previous paragraphs as if fully restated herein.

243.    Plaintiffs assert that DC FEMS's longstanding pattern, practice and custom of race discrimination, and its open hostility to Black employees encumbered their ability to make and enforce an employment contract, and that they were subjected to disparate terms and conditions of employment because of their race, African American.

244.    Plaintiffs assert that DC FEMS has subjected them to disparate and harsher discipline, has ignored their complaints about unfair treatment, has incumbered and stymied their ability to obtain training, limited their career opportunities and withheld promotional opportunities.

245.    Plaintiffs assert that DC FEMS' has a longstanding pattern, practice and custom of making pay decisions that disadvantage Black firefighters, and did so when it decided not to give the firefighters in the Fire Prevention Division EMT premium pay, a decision that only affected Black firefighters.

246.    Plaintiffs assert that DC FEMS has not made them whole, is paying the premium inconsistently, and is still paying them disparately than their white colleagues because they are being paid their premium quarterly, rather than hourly like the other firefighters, which is having an effect on their pension annuity, and on their overtime rate.

247.    Plaintiffs seek to enforce their rights under 42 U.S.C. § 1981, by asserting the instant claim under 42 U.S.C. § 1983, based on the Fifth Amendment to the Constitution as it relates to the District of Columbia.

248.    Plaintiffs ask this Court to award them compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $500,000.00 each.

249.    They also asks this Court for declaratory judgment mandating that they be paid in the same manner and fashion as their colleagues, with their paramedic premium paid on an hourly basis.

## COUNT II

*(On behalf of all Plaintiffs Sanders, Thomas and Smith)*

### (Violation of Title VII of the Civil Rights Act of 1967
### 42 U.S.C. § 2000e, *et seq.* and D.C. Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.* Race Discrimination – Disparate Treatment)

250.    Plaintiffs reference and incorporate all allegations in the previous paragraphs as if fully restated herein.

251.    Plaintiffs asserts that DC FEMS management maintains a pattern and practice of race discrimination against African American employees, and preferential treatment of white firefighters and employees.

252.    Plaintiffs asserts that they was subjected to disparate terms and conditions of employment than white employees, and were subjected to a hostile work environment because of their race.

253.    Plaintiffs asserts that Defendant created a racially hostile work environment at DC FEMS, and that Defendant intentionally and repeatedly ignored the complaints of African American firefighters about disparate and unfair treatment.

254.    Plaintiffs assert that they were subjected to less favorable assignments, were denied training opportunities, and were denied career advancement and promotions because of their race, African American.

255.    As a direct and proximate cause of Defendant's disparate treatment of Plaintiffs, they suffered severe emotional pain, anxiety, stress and mental anguish.

256.    Plaintiffs seek compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than not less than $300,000.00 each.

## COUNT III

*(On behalf of Plaintiffs Sanders)*

**(Violation of Title VII of the Civil Rights Act of 1967**
**42 U.S.C. § 2000e, *et seq.* and D.C. Human Rights Act, District of Columbia Code § 2-**
**1401.01 *et seq.* Race Discrimination – Disparate Impact)**

257.    Plaintiffs reference and incorporate all allegations in the previous paragraphs as if fully restated herein.

258.    Plaintiffs asserts that DC FEMS management maintains facially neutral policies that have a disparate impact on African American employees.

259.    Plaintiffs asserts that they was subjected to facially neutral pay and overtime practices that only affected Black women firefighters in the Fire Prevention Division.

260.    When Plaintiffs complained about the fact that a facially neutral policy was having a disparate impact on them, they were ignored.

261.    When Plaintiffs complained about the fact that a facially neutral overtime policy was having a disparate impact on them, they were ignored.

262.    As a direct and proximate cause of the disparate impact of Defendant's practices and policies, Plaintiffs suffered severe emotional pain, anxiety, stress and mental anguish.

263.     Plaintiffs seek compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than not less than $300,000.00 each.

264.     Plaintiffs further seek declaratory judgment requiring that Defendant modifies its facially neutral policies to ensure that they do not have a negative impact on Plaintiffs and other Black women firefighters at DC FEMS.

### COUNT IV

*(On behalf of all Plaintiffs Sanders, Thomas and Smith)*

**(Violation of Title VII of the Civil Rights Act of 1967
42 U.S.C. § 2000e, *et seq.* and D.C. Human Rights Act, District of Columbia Code § 2-
1401.01 *et seq.* Gender Discrimination – Disparate Treatment)**

265.     Plaintiffs reference and incorporate all allegations in the previous paragraphs as if fully restated herein.

266.     Plaintiffs asserts that DC FEMS management maintains a pattern and practice of gender discrimination against women employees, and preferential treatment of male firefighters and employees.

267.     Plaintiffs asserts that they was subjected to disparate terms and conditions of employment than male employees, and were subjected to a hostile work environment because of their gender.

268.     Plaintiffs asserts that Defendant created a racially hostile work environment at DC FEMS, and that Defendant intentionally and repeatedly ignored the complaints of African American women firefighters about disparate and unfair treatment.

269.     Plaintiffs assert that they were subjected to less favorable assignments, were denied training opportunities, and were denied career advancement and promotions because of their gender.

270.    As a direct and proximate cause of Defendant's disparate treatment of Plaintiffs, they have suffered severe emotional pain, anxiety, stress and mental anguish.

271.    Plaintiffs seek compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than not less than $300,000.00 each.

## PRAYER FOR RELIEF

272.    Plaintiffs herein seek compensatory damages not less than $2,500,000 each.

273.    Plaintiffs further seek relief in the form of an injunction ordering Defendant to cease and desist in its unfair and inequitable pay practices that disparately and disproportionately affect Black women firefighters.

274.    Plaintiffs ask this Court for the declaratory and injunctive relief it deems appropriate to remedy DC FEMS pattern and practice of ignoring complaints from African American firefighters, and particularly from Black women firefighters.

275.    Plaintiffs ask for an order granting them all back pay and lost wages they are entitled to, as well as adjustment to their retirement annuities to reflect what they should have been earning.

276.    Plaintiffs ask for an order mandating that DC FEMS cease and desist denying Black women firefighters equitable overtime opportunities.

277.    Plaintiffs ask this Court for any and all other remedies, of whatever nature, it deems appropriate.

## JURY DEMAND

278.    Plaintiffs demand a jury trial on all claims so triable.


Respectfully submitted,

/s/ *Pamela M. Keith*
Pamela M. Keith [Bar No. 448421]

CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Ave. NW
Suite 600
Washington, DC 20001
Tel: (202) 800-0292
Fax: (202) 807-5725
pamkeith@centerforemploymentjustice.com
*Counsel for Plaintiffs*

# EXHIBIT 1

Notice: This decision may be formally revised before it is published in the *District of Columbia Register*. Parties should promptly notify the Office Manager of any formal errors so that this Office can correct them before publishing the decision. This notice is not intended to provide an opportunity for a substantive challenge to the decision.

## THE DISTRICT OF COLUMBIA

### BEFORE

## THE OFFICE OF EMPLOYEE APPEALS

| | |
|---|---|
| In the Matter of: | ) |
| | )     OEA Matter No.: 1601-0195-11 |
| SHALONDA SMITH, | ) |
|     Employee | ) |
| | )     Date of Issuance: November 27, 2013 |
|        v. | ) |
| | ) |
| D.C. FIRE & EMERGENCY MEDICAL | ) |
| SERVICES DEPARTMENT, | ) |
|     Agency | ) |
| | ) |
| | )     Arien P. Cannon, Esq. |
| | )     Administrative Judge |

Shalonda Smith, Employee, *Pro se*
Kevin Turner, Esq., Agency Representative

## INITIAL DECISION

### INTRODUCTION AND PROCEDURAL BACKGROUND

Shalonda Smith ("Employee") filed a Petition for Appeal with the Office of Employee Appeals ("OEA" or "Office") on August 25, 2011, challenging the D.C. Fire & Emergency Medical Services Department's ("Agency") decision to suspend her for 168 hours. Agency filed its Answer on September 30, 2011. Employee's position of record is a Firefighter. This matter was assigned to me on June 18, 2013.

A Prehearing Conference was held on July 23, 2013, at which time Agency raised the issue of jurisdiction, which was also addressed in its Answer. A subsequent Order on Jurisdiction was issued on July 23, 2013, requiring Employee to submit a statement as to why she believes this Office may exercise jurisdiction over her appeal. Employee submitted her response to the Order on Jurisdiction on August 14, 2013. The undersigned determined in a September 17, 2013 Order that OEA has jurisdiction over this appeal. Accordingly, a Post Prehearing Order was issued. On the due date of Agency's brief, Agency's Representative requested that a telephone conference be held with Employee to clarify the issues and the order in which the parties were to respond to the Post Prehearing Brief. This telephone conference was convened on October 7, 2013. Subsequently, an Amended Post Prehearing Order was issued the

same day. It was determined that this matter should be reviewed under the analysis set forth in *Pinkard v. D.C. Metropolitan Police Department*, 801 A.2d 86 (D.C. 2002), in accordance with the collective bargaining agreement between the two parties. Agency's brief was due on or before October 15, 2013. However, because Agency failed to respond to the Amended Post Prehearing Order, a Show Cause Order was issued on October 21, 2013. Agency responded to the Show Cause Order and submitted its response to the Amended Post Prehearing Order on October 29, 2013. Employee submitted her brief accordingly. The record is now closed.

## JURISDICTION

This Office has jurisdiction in this matter pursuant to D.C. Official Code § 1-606.03 (2001).

## ISSUES

1. Whether the Fire Trial Board's decision was supported by substantial evidence;

2. Whether there was harmful procedural error; or

3. Whether Agency's action was done in accordance with applicable laws or regulations.

## UNDISPUTED FACTS

On March 30, 2010, Employee and her partner, Firefighter Donald Steele, were assigned to Ambulance 32 ("A-32") located at Engine 32 ("E-32"). Around 7:00 p.m. A-32 dropped off a patient at Howard University Hospital (HUH).[1] After A-32 dropped off the patient at HUH, they went to the McDonald's on Georgia Avenue which is located in close proximity to the hospital. When A-32 left HUH, it was in delayed response status as required by Agency's Special Order Number 20, Series 2009. In order to improve ambulance response times in certain areas of the District, Agency implemented the "Delayed Response Program" which allows select units to go into a "delayed response" mode after dropping patients off at a hospital and returning to their local alarm district. Many of the hospitals where these selected units must travel are outside of their local alarm district. Often times, before an ambulance can return to their local alarm district, they are dispatched on other emergency calls which result in a longer wait time for patients located in the selected unit's local alarm district. Under the program, once the units reach the boundary of the Anacostia River (also the boundary of their local alarm district) they are to update their status to "available." A-32 was one of the selected units for the "Delayed Response Program."

On the evening of March 30, 2010, A-32 was being driven by Employee. After leaving McDonald's, A-32 was headed back to their local alarm area and took a route which led them across the South Capitol Street Bridge. At 7:32 p.m., Agency's Communications Division dispatched units to the 4000 block of South Capitol Street, S.E., to respond to a scene where

---

[1] Throughout this decision, Ambulance 32 generally refers to both Employee and Firefighter Donald Steele since they were the crew members on this particular unit at the pertinent times in this case.

multiple people had been shot.[2]   At 7:33 p.m., Agency's I-Tracker device, which is a computer system that shows where units are located throughout the city, placed A-32 on or at the South Capitol Street Bridge.  The South Capitol Street Bridge crosses over the Anacostia River, into the boundaries of A-32's local alarm area.  A-32 was still in "delayed response" mode at this time.  Special Order 20 provides that when selected units reach the boundary of the Anacostia River, they should update their unit status to "available."

Due to traffic congestion on Suitland Parkway, A-32 opted to take an alternate route and go south on Interstate 295 and then to Malcolm X Avenue, S.E. to return to the station quarters. While en route to quarters, there are some discrepancies as to where A-32 was located during an approximately 20 minute time frame.  However, it is undisputed that Ambulance 32 indicated that they were going to get fuel at one point, but were told not to do so by the Communications Division since the city was busy and needed all units to be available in service.

Employee was charged with four counts of misfeasance and one count of insubordination of duty.  The following charges were levied against employee:

Charge 1:            Violation of Article VII, Section 2 of the D.C. Fire and EMS Order Book, which states in part;  "Any on-duty or employment-related act or omission that interferes with the efficiency and integrity of government operations."  This misconduct is further defined in D.C. Fire and EMS' Special Order 20, Series 2009, when **she failed to status her unit in service when she and her partner, Donald Steele, reached their service area.**  This misconduct is defined as cause to wit: "Misfeasance" in 6 DCMR § 1603.3(6), 55 DCR 1775 (February 22, 2008).

Specification 1      On March 30, 2010, while assigned to Ambulance 32, Firefighter Stroman failed to status her unit in service when she reached her service area.  The I-Tracker shows that Ambulance 32 crossed the Anacostia River at 19:34 hours, was at Oakwood Street and Malcolm X Avenue at 19:37 hours, and arrived in the 200 block of Newcomb Street, SE, at 19:40 hours.  She and Firefighter Steele remained in the 200 block of Newcomb Street approximately 15 minutes.  She went into service at 19:47 hours.  At 19:49, she placed Ambulance 32 out of service to refuel.

Charge 2:            Violation of Article VII, Section 2.2 of the D.C. Fire and EMS Order Book, which states in part; "Any on-duty or employment-related act or omission that interferes with the efficiency and integrity of government operations."  This misconduct is further defined in the Fire and EMS Rules and Regulations' Article VI, Section 8, which states: "Members shall refrain from . . . deception; violation or evasion

---

[2] The time is referenced on a 24 hour clock throughout the record; however, a 12 hour clock will be used throughout this decision when referencing a particular time.

of law or official rule, regulation, or order; and from false statements." This misconduct is defined as cause, to wit: "Misfeasance" in 6 DCMR § 1603.3(6), 55 DCR 1775 (February 22, 2008).

Specification 1:    In Firefighter Stroman's March 31, 2010, Special Report entitled "Destination from Howard University", Firefighter Stroman wrote that Ambulance 32 went in service at 19:47 hours on Malcolm X Avenue. However, the I-Tracker records show Ambulance 32 in the 200 block of Newcomb Street, S.E. at 19:40 hours and remained at that location until 19:55 hours. **She provided misleading information to the Department regarding the true status and location of Ambulance 32.**

Charge 3:    Violation of Article VII, Section 2 of the District of Columbia Fire and EMS Department's Order Book which states in part, "Any on-duty act or omission that interferes with the efficiency or integrity of government operations." Article XXIV, Section 6, which states "…3) Vehicles. Refueling of units will be done during off peak of 01:00—09:00 hours. This misconduct is defined as cause to wit: "Misfeasance" in 6 D.C.M.R. § 1603.3(6), 55 DCR 1775 (February 22, 2008).

Specification 1:    Despite the fact that re-fueling ambulances are done when the fuel gauge indicator is at or below ½ tank and that refueling units are done during off peak hours of 01:00—09:00 hours, Firefighter Stroman attempted to place Ambulance 32 out of service for fuel at 19:49 hours when it had over ¾ tank of fuel. During this time, the Department was engaged in a mass casualty incident.

Charge 4:    Violation of Article VII, Section 2 of the District of Columbia Fire and EMS Department's Order Book which states in part, "Any on-duty act or omission that interferes with the efficiency or integrity of government operations." This misconduct is further defined in D.C. Fire and EMS' Order Book, Article XXIV, Section 8(4), which states in part: "Units will return to their respective quarters by the most direct route following the completed disposition of the assigned response. This misconduct is defined as cause to wit: "Misfeasance" in 6 D.C.M.R. § 1603.3(6), 55 DCR 1775 (February 22, 2008).

Specification 1:    On March 30, 2010, while assigned to Ambulance 32, Firefighter Stroman failed to return to quarters by the most direct route from Howard University Hospital.

Charge 5:    Violation of Article VII, Section 2 of the District of Columbia Fire and EMS Department's Order Book which states in part, "Any on-

duty act or omission that interferes with the efficiency or integrity of government operations." This misconduct is further defined in Fire and EMS Department Rules and Regulations', Article VI, Section 5, which states in relevant part: "Members shall…be respectful and obedient to their superior officers." This misconduct is defined as cause to wit: "Insubordination of Duty" in 6 D.C.M.R. § 1603.3(f)(4), 54 DCR 12043 (December 14, 2007).

Specification 1:      On March 30, 2010, while assigned to Ambulance 32, Firefighter Stroman disobeyed Deputy Fire Chief Michael Reilley's Order to place Ambulance 32 in service at 19:49 hours. She did not immediately status her unit in service.

Employee was found "guilty" of charges 1 and 2 only and was issued a 168-hour suspension of duty. She was found "not guilty" on charges 3, 4, and 5. Therefore, only charges 1 and 2 are being appealed by Employee and charges 3, 4, and 5 will not be addressed.

## SUMMARY OF TESTIMONY

On October 7, 2010, Agency held a Trial Board Disciplinary Hearing. The following represents a summary of the relevant testimony given during the hearing as provided in the transcript (hereinafter denoted as "Tr.") which was generated following the conclusion of Employee's proceeding. Both Agency and Employee presented documentary and testimonial evidence during the course of the hearing to support their position.

## Agency's Case in Chief

### *Lieutenant Keith Nickens ("Nickens") Tr. 17-48.*

Nickens testified in relevant part that: on March 30, 2010, he was directed by Battalion Fire Chief Paul Schaeffer to investigate the details of Ambulance 32's out-of-state-service time from HUH to Engine 32 headquarters. In his investigation of Employee and her partner's return from HUH, Nickens stated that the documents he reviewed in his investigation only included ambulance and firehouse journals. Nickens also testified that Special Order No. 20 specifically states that even if an ambulance is in delayed response mode, Communications may override that status and dispatch a unit. Nickens was aware that Ambulance 32 was never dispatched to the shooting incident on South Capitol Street. When Ambulance 32 was told by the Emergency Liaison Officer ("ELO") that they were being placed "in-service," they immediately responded, "okay." Nickens determined, based on his interviews with Employee and Firefighter Steele that A-32 failed to update its status to "available" when they crossed the boundary of the Anacostia River.

Nickens stated that until Ambulance 32 crossed the Anacostia River (South Capitol Street Bridge) it would be appropriate for the ambulance to have been in a delayed response status. When questioned about whether he was aware of there being numerous occasions when

members who were assigned to A-32 did not status the unit as "available" from the moment they crossed the Anacostia River, Nickens stated that he had no knowledge of this practice.

Nickens estimated that it would take approximately five minutes for a unit to reach Engine 32's quarters, traveling in a non-responding fashion, from the time they crossed the Anacostia River. Nickens also acknowledged that if a unit updated its status to "available" and then less than a minute later the unit's status was listed as "at quarters" that means they were close to, or at Engine 32's quarters at the time it changed its status to "available."

Nickens also stated that he would not be surprised if there were 49 separate instances from January 2010 to March 2010 where a unit listed its status as available at or near Engine 32's headquarters.[3] Nickens testified that aside from Employee and Firefighter Steele, he has never charged anyone with failing to update their status to "available" the moment they crossed the Anacostia River. He also testified that he has never verbally advised anyone that they were doing something wrong because they did not update their status to "available" as soon as they reached the boundaries of the Anacostia River. Nickens further testified that Newcomb Street is nowhere near the normal route from Howard University Hospital back to Engine Company 32.

### *Deputy Chief Michael Reilley ("Reilley")* Tr. 51-129

Reilly testified that he was monitoring the I-Tracker system, which shows ambulance locations throughout the city, between 7:00 p.m. and 8:00 p.m. on March 30, 2010. He was also monitoring Ambulance 32 which appeared on the I-Tracker system.

Reilly testified that Special Order No. 20 details the Delayed Response Program that was implemented by Agency. This program was implemented because Agency was having issues with coverage in its "outlying geographical areas." The program was established to give ambulances the opportunity to be in delayed response status when leaving a hospital until reaching their local alarm districts before changing their status to "available." This was done in an attempt to try and have adequate transport coverage throughout the city.

Reilly testified about the special report Firefighter Steele prepared regarding A-32's status and whereabouts on March 30, 2010, after leaving HUH. The special report stated that once Ambulance 32 left HUH it went out of service so that it could return to the local alarm district, or the vicinity of Engine 32's firehouse.

Based on Reilly's reading and understanding of Firefighter Steele's special report, Ambulance 32 went into delayed status to get fuel at 7:49 p.m. The special report also states that at 7:47 p.m., Ambulance 32's status showed that it was in service and available. At 7:49 p.m., Ambulance 32 places itself out of service and shows "en route to get fuel." Based on Reilly's reading and understanding, Ambulance 32 made itself available again at 8:01 pm.

---

[3] During Nickens testimony, Fire Trial Board member Chief Donlon was hesitant to listen to testimony about how other members were treated regarding similar circumstances in which employee was charged.

Reilly testified about Agency's I-Tracker system. I-Tracker is what Reilly describes as the "big eye in the sky." It is a computer system that shows where units are located throughout the city in 500 feet increments in an effort to dispatch the closest available unit in a timely manner. Reilly states that he has used the I-Tracker ever since the Agency got it, but was unable to say for certain how long that has been. He also testified that he believed the I-Tracker is a reliable tool. He further testified that "it's one of those things when it is working, it appears to be very efficient and very reliable...if it is out of service, then it is out of service, but when it works,...it's pretty reliable and it's pretty efficient." Reilly admitted that the I-Tracker does go down, although it is very rare. When it does goes down it will just stop tracking units and units will not appear on the screen to show where they are located.

Chief Vlassopoulos ("Vlassopoulos") provided some clarification on some of the terminology used during Reilly's testimony regarding the use of the I-Tracker. Vlassopoulos described the process for when a unit goes in and out of service (making it available) and the other types of statuses that may be used to help identify whether a unit is available for emergency calls. Vlassopoulos also described what was seen on the computer screen as they tracked A-32: at 7:02 p.m. Ambulance 32 was at Howard University Hospital in "TA" status, which means "transport arrived" at the hospital. At 7:08 p.m. the system observes them again at HUH, in the same vicinity as several minutes before. In the next poll of Ambulance 32, their status went from "TA" to "AM," available mobile, which means they were available for calls. One minute later the unit went out of service in accordance with the guidance and procedures in the delayed response protocol and order (Special Order No. 20). According to Special Order 20, units must clear themselves from the call associated with transporting a patient to the hospital before going in an "out of service" status. Specifically, one cannot go from "transport arrive" status to "out of service" status. Thus, a unit must go from "transport arrive" to "available" and then to "out of service" status. Vlassopoulos described Ambulance 32's movement via the I-Tracker interface and at 7:38 p.m., the tracker had Ambulance 32 between Oakwood Street, SE and Newcomb Street, SE. At 7:39 the unit was in the middle of Newcomb Street, between 4th and 5th Street. At 7:40 p.m., it was on Newcomb Street between 2nd and 4th Street. Based on enlarged images, Vlassopoulos says it looked like Ambulance 32 was between 257 and 261 Newcomb Street.

Reilly further testified that to his knowledge, Firefighter Steele's address on record with Agency is 261 Newcomb Street. Between 7:40 and 7:54, the I-Tracker had A-32 placed on Newcomb Street without any movement. At 7:54, there was movement and the unit was still in "out of service." At 8:01 p.m., A-32's status went from out of service to available for emergency response. According to the I-Tracker, A-32 reached Engine 32's headquarters at 8:05 p.m. Vlassopoulos testified that there was no connection problem with the I-Tracker at the time he was tracking A-32. If there was a connection problem, the system would not have been able to track A-32 at all.

I-Mobile was described as the device inside of the ambulance for crew members to update the ambulance's status to one of the various options such as en route, available, or transporting a patient. Reilly further testified that there were some problems with the I-Mobile on March 30, 2010, but none with the I-Tracker, which tracks the location of the units. Reilly stated that he verbally instructed the Emergency Liaison Officer ("ELO") to place A-32 in

service because he observed them driving around on the I-Tracker system and listed as "out of service."

Reilly stated that A-32 was the closest resource unit to the incident that did not respond to the scene. Reilly also testified that in a perfect world, units would update their status to available as soon as they crossed the boundaries to the Anacostia River.

## Employee's Case in Chief

### *Lawanda Calloway ("Calloway")* Tr. 130-139

Calloway previously worked for Office of Unified Communications ("OUC") and D.C. Fire and Communications for 31 years. She testified that the Communications Department for Agency has the ability to place a unit in service. She stated that it was as simple as using the mouse on the computer to click "unit in service" and the unit would go in service. Calloway stated that if Communications tells an ambulance unit that they are manually being placed in service then the lead Communications operator of that radio would assume the responsibility for placing the unit in service.

During cross examination, Calloway stated that she left the Office of Communications in October of 2007. Although she was not on duty the day of the incident, she states that she still has friends who talk about orders within the department and she has some familiarity with Special Order 20.

### *Captain Juan Carter ("Carter")* Tr. 139-147

Carter described Employee as "reliable and dependable." Carter was told that one of the theories that served as the basis of the charges against Employee was that she purposefully remained out of service to avoid being dispatched and helping out with the mass casualty shooting on the evening of the incident. Carter stated that this theory was not consistent with the behavior that he knew of Employee. He also stated that while Employee was under his supervision, she was always diligent in her duties and responsibilities and that he did not have any complications with her.

Carter testified that he would not have a problem working with someone who failed to service their unit in service in a timely manner. In summation, Carter stated that this incident does not leave him with a negative impression of Employee.

### *Deputy Fire Chief Cornelius Campbell ("Campbell")* Tr. 161-181

Campbell testified that he has been with the Agency for over 23 years and had served as Deputy Fire Chief for two years at the time of the hearing. He testified that he is only aware of one case that was similar to the charges before Employee in this case. Specifically, the other case Campbell referenced was when charges were proffered against two members of the Fire Department who were riding in Ambulance 10 and they intentionally took the ambulance to an area outside of the District and sat there for approximately 5 to 6 hours. During this time, those

members did not take any calls in their service area. Campbell stated that he believes there is a big distinction between the instant case and the case he described where two members were out of service for 5-6 hours and did not take any calls in their service area. Campbell further stated that although a Fire Trial Board was held in that case, neither of the members was terminated.

### *Battalion Fire Chief Edward Pearson ("Pearson")* Tr. 182-196

Pearson testified that Employee was "very conscientious" and really cared about her job and provided quality service to the Department. He also testified that the theory that Employee purposefully kept her unit out of service in order to avoid being dispatched to the mass casualty incident seems very uncharacteristic of her. Pearson also said it is not uncommon to take alternate routes to get back to headquarters because of traffic.

### *Captain Patrick Banks ("Banks")* Tr. 197-208

Banks testified to the character of Employee and stated that she never worked directly under his supervision. Other than training Employee, he has not really kept up with her.

### *Firefighter Donald Steele ("Steele")* Tr. 209-265

Steele testified, in relevant part, that: he acknowledged that A-32 did not put their unit in service once they got to the Anacostia River as required by Special Order No. 20.

When asked about how he came up with the times he provided in his special report, Steele stated that he consulted the computer on A-32. In his special report, Steele wrote that A-32 put their unit in service at 7:47 p.m. and then at 7:49 p.m. Steele's special report reads as follows:

> On March 30, 2010 after leaving hospital 5. A-32 went out of service to return to our first due area. Once we got off of 295 at Malcom (sic) X avenue exit we went in service at 1947 hours, and at 1949 hours we decided to go get fuel we status in delayed to go get fuel. Immediately afterwards a DFC came on the radio telling us we where (sic) the only ambulance in the city and we could get fuel later. He then said we were in service, we then advised. We returned to quarters and we then received a run at 2018 at 2700 Jasper St. SE.

To further help explain exactly what he meant when he stated that "…we then advised," Steele says that he meant A-32 acknowledged over the radio that they were being placed in service by Communications.

Steele also testified that he has encountered problems with I-Mobile on previous occasions. Specifically, the I-Mobile will show that the ambulance is still on the scene of an emergency call when in actuality they are at the hospital. He also stated that there have been times when they have tried to press the button to status the unit in a particular status, but the

status of the unit would not change on the monitor screen. He also testified that there have been occasions when the unit was in out of service or in delayed response and Communications still dispatched them on an emergency call and they would respond to the scene. On March 30, 2010, Steele says they were not dispatched on a run during the time frame in question nor were they ever asked if they could respond to the South Capitol Street shooting incident.

Steele testified on cross-examination that A-32 was never parked on the 200 block of Newcomb Street on March 30, 2010. Steele stated that it was their policy to update their status to "available" once they got to Suitland Parkway, although it was inconsistent with Special Order No. 20. He further stated that A-32 stopped at the bus stop near the intersection of Martin Luther King Jr. Avenue and Newcomb Street so that Employee could talk to Communications.

### *Firefighter Shalonda Stroman Smith ("Employee")* Tr. 265-332

Employee testified, in relevant part, that: she has never been brought up on charges prior to this incident. Employee acknowledged that as she was coming down South Capitol Street that their unit was still in delayed response status. She also acknowledged that Special Order No. 20 says it should go into service soon as they get to the Anacostia River Boundaries. Employee stated that she intended to go in service once she got on Suitland Parkway but because she ended up taking a different route down South Capitol Street because of heavy traffic on Suitland Parkway, it slipped her mind to press the in service button. She realized that she had forgotten to do so and put A-32 in service once they turned onto Malcolm X Ave, SE. She also testified that as long as she's been with A-32, it was normal practice to put the unit in service once they reached Suitland Parkway.

Once Employee put A-32 in service after turning onto Malcolm X Avenue, she stated that they decided to fill up on fuel. Rather than making a U-turn on Malcolm X Avenue, she made a left onto Oakwood Street, which is one street over from Newcomb Street. Because Employee was not familiar with the area, she heeded the directions of her partner, Firefighter Steele. Employee states that she was trying to get back to Malcolm X Avenue so she could make a right turn and then make a left turn back onto South Capitol Street and proceed to Blue Plains to get fuel. However, prior to getting fuel, she heard Chief Reilly contact the ELO and direct A-32 to stay in service and not get fuel since the city was dealing with a mass casualty shooting. Soon thereafter, ELO contacted A-32 directly and told them that the city was too busy to get fuel and that they were being placed in service. Employee stated that she pulled over to talk to the ELO during this conversation because she does not like to talk on her radio while driving. After this conversation with the ELO, Employee proceeded to drive to the headquarters of Engine 32. She states that at no time was A-32 stopped at 261 Newcomb Street. She also was not aware that her partner Steele lived in the Newcomb Street area until after the fact.

Employee testified that when the ELO came over the radio and said that A-32 was being placed in service, she did not press the button on the I-Mobile because she was being told by the ELO that they would place A-32 in service themselves. Employee also testified that at some point after the conversation with the ELO, they realized that the I-Mobile still did not have them listed as in service. She then started clicking the button in an attempt to change A-32's status to

available, but it would not change. She states that Steele also tried to change their status on the I-Mobile to in service, but it still would not change.

Once they finally arrived at quarters, they changed their status to "at quarters," which indicated they were at the headquarters for Engine 32. About ten minutes after being at quarters they were placed on an emergency run which was across the street and in close proximity to the station. After the emergency call across the street, they received a second call which resulted in them transporting a patient to the hospital. As they were sitting in the ambulance at the hospital, an ELO told them to call a land line at which time Employee complied. During the conversation while on the land line phone, she was told to place A-32 out of service and head back to quarters. Once they got back to quarters, they were informed by Lieutenant Delahaney that the deputy fire chief ordered that Employee and Steele prepare special reports concerning their whereabouts when they left Howard University Hospital and came back to headquarters. Employee's report reads as follows:

> After leaving Hospital 05 at 1909 hours, A-32 proceeded to go out of service to return to first due area. A-32 ran into traffic while proceeding to E-32's first due area. A-32 went in service at 1947 hours on Malcolm X Ave. The crew members of A-32 then decided we will go get fuel to top off our fuel tank. At 1949 A-32 went out of service to go get fuel. The DFC came over channel 13 and stated to ELO "Have A-32 stay in service, they can get fuel later." ELO replied ok, ELO then requested A-32 over channel 13. A-32 responded "A-32" and was told by ELO to not go get fuel at the time because we were the only ambulance in the city available and it was too busy, A-32 stated ok. ELO stated A-32 was being placed in service. A-32 stated ok. We then turned from channel 13 to channel 1 to monitor dispatched calls. We then returned to E-32's Quarters.

In preparing her special report, Employee stated that she estimated the times she provided based on the unit history log. Employee testified that if she could go back to the evening on March 30, 2010, that she would have made A-32 available at the Anacostia River boundaries, as opposed to waiting until she turned onto Malcolm X Avenue. Employee also testified that she was aware that Agency could track the location and time of the location on any ambulance. She further testified that the I-Mobile malfunctioned on March 30, 2010, but did not report it because it was a common occurrence and did not feel the need to report it.

## ANALYSIS AND CONCLUSIONS OF LAW

Pursuant to the *Pinkard*[4] analysis, an Administrative Judge of this Office may not conduct a *de novo* hearing in an appeal before him/her, but must rather base his/her decision solely on the record below at the Fire Trial Board Hearing, when all of the following conditions are met:

---

[4] *Metropolitan Police Department v. Pinkard*, 801 A.2d 86 (D.C. 2002).

1. The appellant (Employee) is an employee of the Metropolitan Police Department or the D.C.   Fire & Emergency Medical Services Department;

2. The employee has been subjected to an adverse action;

3. The employee is a member of a bargaining unit covered by a Collective Bargaining Agreement;

4. The Collective Bargaining Agreement contains language essentially the same as that found in *Pinkard*, i.e.: "[An] employee may appeal his adverse action to the Office of Employee Appeals. In cases where a Departmental hearing [i.e., Trial Board Hearing] has been held, any further appeal shall be based solely on the record established in the Departmental hearing"; and

5. At the agency level, Employee appeared before an Adverse Action Panel that conducted an evidentiary hearing, made findings of fact and conclusions of law, and recommended a course of action to the deciding official that resulted in an adverse action being taken against Employee.[5]

Based on the documents of records and the position of the parties as stated during the Prehearing Conference and Telephone Conference held in this matter, I find that all of the aforementioned criteria are met in the instant matter.   Therefore, my review is limited to the issues as set forth in the "Issues" section of this Initial Decision.   Further, according to *Pinkard*, I must generally defer to the [Trial Board's] credibility determinations when making my decision.[6]

### Whether the Trial Board's decision was supported by substantial evidence.

Substantial evidence is defined as evidence that a reasonable mind could accept as adequate to support a conclusion.[7]   If the [Trial Board's] findings are supported by substantial evidence, I must accept them even if there is substantial evidence in the record to support contrary findings.   *See Metropolitan Police Department v. Baker*, 564 A.2d 1155 (D.C. 1989).

*Charge 1*

Here, Employee admitted that she did not follow Special Order 20 by failing to status A-32 as available once she reached the boundary of the Anacostia River.   However, she raises a claim of disparate treatment.   In *Jordan v. Metropolitan Police Department*, OEA Matter No. 1601-0285-94, Opinion and Order on Petition for Review (September 29, 1995), this Office's Board set forth the law regarding a claim of disparate treatment:

---

[5] *See Id.*
[6] *Id.*
[7] *Black's Law Dictionary*, Eighth Edition; *Mills v. District of Columbia Department of Employment Services*, 838 A.2d 325 (D.C. 2003); and *Black v. District of Columbia Department of Employment Services*, 801 A.2d 983 (D.C. 2002).

[An Agency must] apply practical realism to each [disciplinary] situation to ensure that employees receive fair and equitable treatment where genuinely similar cases are presented. It is not sufficient for an employee to simply show that other employees engaged in misconduct and that the agency was aware of it, the employee must also show that the circumstances surrounding the misconduct are substantially similar to [her] own. Normally, in order to show disparate treatment, the employee must demonstrate that he or she worked in the same organizational unit as the comparison employees and that they were subject to [disparate] discipline by the same supervisor [for the same offense] within the same general time period.

An employee who raises an issue of disparate treatment bears the burden of making a *prima facie* showing that he or she was treated differently from other similarly-situated employees.[8] If such a showing is made, then the burden shifts to the agency to produce evidence that establishes a legitimate reason for imposing a different penalty on the employee raising the issue.[9] "In order to prove a disparate treatment, [Employee] must show that a similarly situated employee received a different penalty."[10] In determining whether a penalty is reasonable it is appropriate to consider whether the agency has meted out similar penalties for similar offenses. *See Stokes v. District of Columbia*, 502 A.2d 1006 (D.C. 1985).

Employee testified that it was common practice among all four shifts that operate A-32 to status the unit as available once they reached Suitland Parkway or closer to E-32's quarters. Suitland Parkway is well within the boundaries of the Anacostia River. Employee introduced the Unit History of A-32 from January 2010 through March 2010 to the Trial Board which demonstrated at least 49 different instances where members on all four shifts made A-32 available at or near headquarters after returning from a hospital run. Members on all four shifts who operate A-32 are similarly situated to Employee. It can be determined that those who were assigned to A-32 made the unit available at or near headquarters based on the close proximity in time that the status changed from "Delayed Response" back to "Available Mobile" and then to "At Quarters."[11] Several of the instances in which Employee highlights in the Unit History of A-32, illustrate that members frequently switched from "Delayed Response" status to, "Available Mobile" and then to "At Quarters" within seconds of each other. In several other instances, A-32's status changed from "Delayed Response" to "Available Mobile" and then "At Quarters" within one or two minutes of each other. This demonstrates that members who operated A-32 regularly changed the status of the unit to "available" at or near Engine 32's quarters. This establishes a common practice within Agency. To status unit A-32 as available at or near headquarters is in direct contradiction to Special Order 20.

---

[8] *See Hutchinson v. D.C. Fire Department*, OEA Matter No. 1601-01190-90, Opinion and Order on Petition for Review (July 22, 1994).
[9] *Id.*
[10] *Social Sec. Admin. v. Mills*, 73 M.S.P.B. 463 (1991).
[11] Ambulance 32's Unit History abbreviates the pertinent statuses of the unit as follows: Delayed Response= DELAYRSP; Available Mobile= AM; and At Quarters= AQ

Nickens testified that it would take A-32 approximately five minutes to reach Engine 32's quarters, traveling in a non-responding fashion, from the time they crossed the Anacostia River. This indicates that if A-32's status changed from "available mobile" to "at quarters" within seconds or minutes of each other, then the unit was already well within the boundaries of the Anacostia River and not in compliance with Special Order 20. Nickens also testified that aside from Employee and Firefighter Steele, he has never charged anyone because they did not update their unit to "available" the moment they crossed the Anacostia River. He further stated that he has never verbally advised anyone that they were doing something wrong because they did not status the unit as available as soon as they reached the boundaries of the Anacostia River. Based on this testimony, it is clear that Employee has met her burden for establishing disparate treatment. Agency does not offer any reason for imposing a different penalty against Employee for failing to make A-32 "available" soon as she crossed the Anacostia River versus other employees who failed to make A-32 available as soon as they crossed the Anacostia River. As such, the penalty imposed against Employee for charge one must be reversed.

*Charge 2*

Employee and Firefighter Steele had a consolidated hearing before the Fire Trial Board in which it considered identical charges brought against both employees. The specifications of each charge were also essentially the same. Employee argues that she was subjected to disparate treatment for the charge of providing false and misleading information to Agency regarding the true status and location of Ambulance 32 after returning from HUH on March 30, 2010. Specifically, Employee asserts that her partner, Firefighter Steele, provided the same status, times, and location in his special report that she provided in her special report. However, her partner, Firefighter Steele, was found "not guilty" of providing false and misleading information regarding the status and location of Ambulance 32 after returning to quarters from HUH. Employee was found "guilty" of providing false and misleading information to Agency regarding the status and location of Ambulance 32.

In Employee's special report, she wrote that "A-32 went in service at [7:47 p.m.] on Malcolm X Ave." She further wrote that at "[7:49 p.m.] A-32 went out of service to go get fuel." A-32 returned to Quarters after corresponding with the ELO who advised them not to get fuel and go out of service because the city was "too busy." In Steele's special report, he states that after leaving the hospital, A-32 went out of service to return to their alarm district. Steele also stated that "once we got off of 295 at [Malcolm] X avenue exit we went in service at [7:47 p.m.], and at [7:49 p.m.] we decided to go get fuel we status in delayed to go get fuel (sic)." Steele's report further stated that immediately after putting the unit out of service to go get fuel, they heard the Deputy Fire Chief over the radio saying A-32 was the only available ambulance in the city at the time and that they could get fuel later. Once A-32 was advised they were being put back in service by Communications, they returned to headquarters.

Employee's special report and Steele's special report provide the exact same time for when they placed A-32 in service as available and the same time for when they went out of service to go get fuel. Both Employee's and Steele's testimony given at the Trial Board corroborated what was written in their special reports. Despite providing the same information about the status and location of A-32, the Fire Trial Board found Employee "guilty" on the

charge of providing false and misleading information to the Agency, and found Steele "not guilty" of providing false and misleading information to the Agency. Employee provided a copy of the Final Decision issued to Firefighter Steele in which the Trial Board found him "not guilty" of charge two. A copy of the Final Agency Decision issued to Employee was also provided in the record. Employee has established a *prima facie* argument that Agency treated her differently from her partner, Steele, who is a similarly-situated employee. Agency did not provide any reason as to the different treatment Employee received versus the treatment Steele received in regard to charge two in this case. The inconsistent findings by the Fire Trial Board, as it relates to charge two against Employee and Firefighter Steele, exemplify the disparate treatment Employee received by Agency. Agency does not offer any reason for imposing different penalties for Employee and Firefighter Steele, despite providing the same information regarding the status and location of A-32 on the evening on March 30, 2010. As such, the penalty imposed against Employee for charge two, providing false and misleading information to Agency, must be reversed.

Because I have found that Employee was subjected to disparate treatment by Agency, I will not address issues two and three: whether there was harmful procedural error, or whether the Agency's action was in accordance with the law and applicable regulations.

## ORDER

Accordingly, it is hereby **ORDERED** that:

1. Agency's 168-hour suspension of Employee is **REVERSED**;

2. Agency shall immediately reimburse Employee all back-pay and benefits lost from her 168-hour suspension; and

3. Agency shall file with this Office, within thirty (30) calendar days from the date on which this decision becomes final, documents evidencing compliance with the terms of this Order.

FOR THE OFFICE:

Arien P. Cannon, Esq.
Administrative Judge

## NOTICE OF APPEAL RIGHTS

This is an Initial Decision that will become a final decision of the Office of Employee Appeals unless either party to this proceeding files a Petition for Review with the Office. A Petition for Review must be filed within thirty-five (35) calendar days, including holidays and weekends, of the issuance date of the Initial Decision in the case.

All petitions for review must set forth objections to the Initial Decision and establish that:

1. New and material evidence is available that, despite due diligence, was not available when the record was closed;

2. The decision   of the presiding official is based on an erroneous interpretation of statute, regulation or policy;

3. The findings of the presiding official are not based on substantial evidence; or

4. The Initial Decision did not address all the issues of law and fact properly raised in the appeal.

All Petitions for Review should be supported by references to applicable laws or regulations and make specific reference to the record. The Petition for Review, containing a certificate of service, must be filed with the General Counsel's office, D.C. Office of Employee Appeals, 1100 4th St., SW (East Building), Suite 620E, Washington, DC 20024. Three (3) copies of the Petition for Review must be filed. Parties wishing to respond to a Petition for Review must file their response not later than thirty-five (35) calendar days, including holidays and weekends, after the filing of the Petition for Review

Instead of filing a Petition for Review with the Office, either party may file a Petition for Review in the Superior Court of the District of Columbia. To file a Petition for Review with the Superior Court, the petitioning party should consult Superior Court Civil Procedure Rules, XV. Agency Review, Rule 1.

**CERTIFICATE OF SERVICE**

I certify that the attached **INITIAL DECISION** was sent by regular mail
this day to:

Shalonda Stroman Smith
5812 Coolidge Street
Capitol Heights, MD 20743

Kevin Turner, Esq.
Office of the Attorney General
For the District of Columbia
441 4th St., NW
Suite 1180N
Washington, DC 20001

Katrina Hill
Clerk

November 27, 2013
Date